**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
      lrosen@rosenlegal.com

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Fax: (877) 590-0483
Email: brian@schallfirm.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUFAT ILYASOV, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | <u>JURY TRIAL DEMANDED</u> |
| KINDERCARE LEARNING COMPANIES, INC., PAUL THOMPSON, ANTHONY AMANDI, JOHN T. WYATT, JEAN DESRAVINES, CHRISTIEN DEPUTY, MICHAEL NUZZO, BENJAMIN RUSSELL, JOEL SCHWARTZ, ALYSSA WAXENBERG, PRESTON GRASTY, PARTNERS GROUP HOLDINGS AG, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL, INC., and UBS SECURITIE SLLC, | <u>CLASS ACTION</u> |
| Defendants. | |

1

Plaintiff Rufat Ilyasov ("Plaintiff"), on behalf of himself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by KinderCare Learning Companies, Inc. ("KinderCare" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of KinderCare common stock in or traceable to the Company's October 2024 initial public offering (the "IPO") seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act") against KinderCare, the Company's senior officers and directors, the Company's controlling shareholder, and the underwriters of the IPO.

## JURISDICTION AND VENUE

2.      The claims alleged herein arise under and pursuant to Sections 11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of KinderCare common stock in this District.

## PARTIES

6.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities pursuant and/or traceable to the IPO and was damaged thereby.

7.     Defendant KinderCare is a provider of early childhood and school-age education in the United States.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KLC."

8.     Defendant Paul Thompson ("Thompson") served as KinderCare's Chief Executive Officer ("CEO") at the time of the IPO.

9.     Defendant Anthony Amandi ("Amandi") served as KinderCare's Chief Financial Officer at the time of the IPO.

10.     Defendant John T. Wyatt ("Wyatt") served as KinderCare's CEO from 2012 through May 2024, including in 2015 when private equity firm Partners Group (defined below) acquired KinderCare (then known as Knowledge Universe).  Defendant Wyatt served as Chairman of the Company's Board of Directors ("Board") at the time of the IPO.

11.    Defendant Jean Desravines ("Desravines") served as a director of KinderCare at the time of the IPO.

12.    Defendant Christine Deputy ("Deputy") served as a director of KinderCare at the time of the IPO.

13.    Defendant Michael Nuzzo ("Nuzzo") served as a director of KinderCare at the time of the IPO.

14.    Defendant Benjamin Russell ("Russell") served as a director of KinderCare at the time of the IPO.  At the time of the IPO, defendant Russell also served as a Senior Vice President at defendant Partners Group.

15.    Defendant Joel Schwartz ("Schwartz") served as a director of KinderCare at the time of the IPO.  At the time of the IPO, defendant Schwartz was also a Partner at defendant Partners Group.

16.    Defendant Alyssa Waxenberg ("Waxenberg") served as a director of KinderCare at the time of the IPO.

17.    Defendant Preston Grasty ("Grasty") served as a director of KinderCare at the time of the IPO.  At the time of the IPO, defendant Grasty was also a Senior Investment Leader at defendant Partners Group.

18.    The defendants identified in ¶¶8-17 are referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement.  In additional, several Individual Defendants were named as directors of KinderCare in the Registration Statement as detailed above.  The Individual Defendants participated in the solicitation and sale of KinderCare common stock to investors in the IPO for their own benefit and the benefit of

KinderCare and Partners Group as directors, executive officers, and/or major shareholders of the Company and/or the principals of Partners Group.

19.     Defendant Partners Group Holding AG ("Partners Group") is a Swiss private equity firm.  Partners Group (through investment funds affiliated with, advised by, or managed by affiliates of Partners Group) owned KinderCare prior to the IPO.  Immediately after consummation of the IPO, Partners Group (through affiliated entities) owned a controlling interest (69%) in KinderCare's outstanding shares including the full exercise of the underwriters' over-allotment option.  Partners Group further exercised its control over the Company through its nomination of five of the Board's eight directors.  Indeed, the Registration Statement acknowledged that, following the IPO, KinderCare would be a "controlled company" within the meaning of the corporate governance rules of the NYSE.  The Registration Statement further acknowledged that Partners Group controlled KinderCare, including control over the election of KinderCare's directors, business affairs, policies, appointment of management, and entrance into business combinations or dispositions and other corporate transactions.

20.     Prior to going public, Partners Group extracted tens of millions of dollars from KinderCare through a variety of service transactions and other agreements with the Company.

21.     Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc. ("Barclays"), and UBS Securities LLC ("UBS") are referred to herein as the "Underwriter Defendants."  Pursuant to the 1933 Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement as follows:

    a.  The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities.  They served as underwriters of the IPO and shared in the over $36 million in underwriting

fees generated by the IPO, which included the full exercise of the underwriters' over-allotment option. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of KinderCare common stock in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market KinderCare common stock, and those personnel worked on and approved the content of KinderCare's Registration Statement and other offering materials.

b.  In addition, Barclays and UBS received additional proceeds from the IPO, as the net proceeds from the offering were used in substantial part to repay loans issued by these banks to KinderCare.

c.  The Underwriter Defendants demanded and obtained an agreement from KinderCare that KinderCare would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that KinderCare had purchased millions of dollars in directors' and officers' liability insurance.

d.  Representatives of the Underwriter Defendants also assisted KinderCare and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of KinderCare, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course

of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning KinderCare's operations and financial prospects.

e.  In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with KinderCare's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which KinderCare stock would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about KinderCare would be made in the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and KinderCare's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of KinderCare's existing problems as detailed herein.

f.  The Underwriter Defendants solicited and sold in the IPO KinderCare common stock to plaintiff and other members of the Class (defined below) for their own financial benefit. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

22.  On June 23, 2021, FTA filed with the SEC its final prospectus for the IPO on Form

424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO, FTA sold approximately 82,500,000 ADSs at $19.00 per ADS.

23.     Defendant KinderCare provides early education and child care services in the United States. The Company opened its first facility in 1969 and since then has grown to over 2,400 locations in 41 states and the District of Columbia. The Company serves children ranging form 6 weeks to 12 years of age with over 1,500 early childhood education ("ECE") centers and approximately 900 before-school and after-school sites.

24.     The Company operates under three main brands designed to address key parent demographics: (i) KinderCare Learning Centers ("KCLC"); (ii) Crème School; and (iii) Champions. KCLC claims to be the largest private provider of early child care and education centers in the United States by center capacity. Crème School is the Company's "premium" child care offering. Champions is a provider of before-school and after-school programs onsite at schools in the United States.

25.     KinderCare contends its "mission is to provide high-quality ECE for families of all backgrounds and means." KinderCare emphasizes the purported effectiveness of its programs in "children from lower income or minority populations," and has a special program for military service members and certain federal workers.

26.     Over 30% of the Company's revenues come from federal subsidies, primarily provided through the Child Care Development Fund ("CCDF"), as authorized under the Child Care & Development Block Grant ("CCDBG"), a federal program that provides funding to states to assist low-income families with child care costs. In 2024, for instance, KinderCare received $942.1 million in subsidy revenue from government agencies, approximately 35% of the Company's $2.66 billion total revenue.

27.     Swiss private equity firm Partners Group Holdings AG ("Partners Group") acquired KinderCare in 2015.  Partners Group has long sought to take KinderCare public. The Company was initially set to go public in late 2021 when Partners Group sought to raise up to $540 million at an approximate $3 billion valuation. But the Company's listing was unexpectedly postponed on the day of its scheduled IPO, with KinderCare ultimately abandoning its plans while citing unexplained "regulatory delays."

28.     Three years later, on September 6, 2024, KinderCare filed with the SEC a registration statement for the IPO on Form S-1, which, after amendments, was declared effective on October 8, 2024 (the "Registration Statement"). On October 9, 2024, KinderCare filed with the SEC a prospectus for the IPO on Form 424B4, which was incorporated into and formed part of the Registration Statement.

29.     Defendants used the Registration Statement to sell over 27 million shares of KinderCare common stock to investors at $24 per share, which included the full exercise of the Underwriter Defendants' over-allotment option. The IPO raised $648 million in gross offering proceeds.

30.     The Registration Statement contained material misrepresentations about KinderCare's business, the quality of care and education it has purportedly provided "throughout" its history, and the nature and magnitude of the risks and uncertainties that investors faced at the time of the IPO.

31.     For example, the Registration Statement praised the "unwavering" and "constant" "high-quality" care that KinderCare teachers and employees provided to "each" student and their families, going so far as to describe the child care offered by the Company as "the highest quality care possible" and a "safe, nurturing and engaging environment."

32.     In truth, prior to the IPO KinderCare provided substandard care, including numerous incidents of child endangerment, for example, instances where toddlers escaped facilities and roamed into traffic, children were left locked in facilities or buses, and kids were subject to intentional acts of physical, verbal, and sexual abuse.

33.     Since the IPO, which occurred less than one year before the filing of this complaint, the price of KinderCare stock has fallen to lows near $9 per share – a fraction of the $24 per share IPO price.  The price of KinderCare stock has remained substantially below the IPO price at the time of filing this complaint.

**Materially False and Misleading Statements and Omissions in the Registration Statement[1]**

34.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

35.     Specifically, the Registration Statement stated that KinderCare delivered "the highest quality care possible" to "each child" on a "constant" basis, stating in pertinent part as follows:

> Since we first opened our doors and rang our bell in 1969, our calling has remained consistent: to help hard-working families pursue their dreams.  The world has changed in the last 50 years, and so have we.  ***Through it all, our commitment to delivering the highest quality care possible for families, regardless of who they are or where they live has never changed***.  From one red roof to over 2,000 locations nationwide, today we're a collection of thousands of big and little stories being written every day.  ***A community of more than 43,000 passionate employees striving to make each child's potential shine***.  A human-powered network in 40 states working individually and collectively.  ***Through it all, what we do for children and families remains constant.  We are caregivers.  We are educators.  We impart a lifetime love of learning.  But we are so much more.  We are builders.  Of confidence in***

---

[1] Unless stated otherwise, all emphasis is added to quotations.

***children.  Of unshakable self-worth.  Of conviction they carry with them as
they take their first steps, and every step toward taking on the world***.

36.    The Registration Statement further represented that the Company was grounded in

"four pillars" that enabled the Company, through the "best teachers and center staff," to deliver

the "best care and education" to "[e]very family" and "their child" in a "safe" and "nurturing"

environment that included KinderCare's purportedly "unwavering devotion to children," stating

in pertinent part as follows:

Our company purpose is grounded in four pillars:

**Educational Excellence**

Every family wants the best care and education for their child.
***We deliver that through our proprietary curriculum, our commitment
to accreditation – the third-party validation of the high standards in
our classrooms, and through assessments that consistently prove
KinderCare children are better prepared for kindergarten and beyond
than their peers outside our programs***.

**People & Engagement**

***Our industry-first talent filter helps us hire the best teachers
and center staff who will thrive in our classrooms***.  Our annual
employee and family engagement surveys build culture, identify how to
best serve children and families, and drive business performance.  That's
helped us win the Gallup Exceptional Workplace Award for the last
eight years – one of only two employers globally.

**Health & Safety**

***We hold sacred our responsibility to protect and nurture the
children in our care.  Our rigorous safety standards across all
classrooms are reinforced by ongoing training and measurement
tools***.  We build healthy bodies and minds through nutritious meals, and
physical activity programs, and our dedicated resources support teacher
and child mental health and emotional safety.

**Operations & Growth**

***We bring these high-quality standards to more families and
communities each season***.  We do this by building new centers and

11

inviting smaller high-quality providers to join KinderCare. We work with school administrators and public and private employers to expand access to our programs. As we grow our reach, we reinvest in all our pillars to elevate our impact in each.

*These pillars guide each of our employees every day, in classrooms across the country*. While our footprint is large, it's the footsteps of each child in our care that inspire us. *Our unwavering devotion to children gives families peace of mind to pursue their dreams and to integrate work and life*. Because strong and vibrant communities depend on access to high-quality child care for all, we serve the full socio-economic spectrum of American families – from the public to the private sector and those of modest means. This isn't a requirement from regulators or any branch of government, it's a matter of principle we've held true to for the last 55 years and will continue upholding for all the years ahead of us.

37.    Similarly, in describing the Company's "Mission," the Registration Statement highlighted the "safe, high-quality" care the Company provided to "each" child, stating in pertinent part as follows:

*We build confidence for life by providing safe, high-quality early childhood and school-age education and care for families of all backgrounds and means. Serving children from six weeks to 12 years of age, we are committed to providing each of them with the very best start in life through high quality educational experiences in a nurturing and engaging environment*.

38.    Likewise, the Registration Statement emphasized the Company's purported provision of "high-quality" education and care to "all children . . . in a safe, nurturing and engaging environment," stating in pertinent part as follows:

*We are the largest private provider of high-quality ECE in the United States by center capacity. We are a mission-driven organization, rooted in a commitment to providing all children with the very best start in life*. We serve children ranging from six weeks to 12 years of age across our market-leading footprint of over 1,500 early childhood education centers with capacity for over 200,000 children and approximately 900 before- and after school sites located in 40 states and the District of Columbia as of June 29, 2024. *We believe families choose us because of our differentiated, inclusive approach and our commitment to delivering every child a high-quality educational experience in a safe, nurturing and engaging environment*.
*Our steadfast commitment to quality education offers an attractive value proposition to the children, families, schools and employers we serve, driven by our*

12

*market-leading scale, proprietary curriculum instructed by our talented teachers and dedication to safety, access and inclusion*.

39.    The Registration Statement further described the Company's operating strategy as being designed, based on the Company's "four pillars," to "consistently" "deliver a high-quality" "education experience" "for every child and family" "across all of [KinderCare's] centers and sites," stating in pertinent part as follows:

> *Our operating strategy is designed to deliver a high-quality, outcomes-driven, education experience for every child and family we serve across all of our centers and sites*.  This self-reinforcing strategy is anchored in four pillars:
>
> *    *    *
>
> •        **People & Engagement.  *We utilize a proprietary, data-driven approach to attract, hire and develop exceptional talent.  We believe that our culture builds emotional connections between our employees and our mission and values, driving high engagement across our organization***.
> •        **Health & Safety.  *We consistently adhere to strict procedures across all of our centers to provide a healthy, safe environment for our children and our workforce and to deliver confidence and peace of mind to families***.

40.    The Registration Statement emphasized that "throughout" the Company's 50-plus-year history KinderCare had delivered "high-quality" education and care without any mention of the numerous lapses in care quality during that time, representing: "We have provided children and families with high-quality ECE for over 50 years."  The Registration Statement continued by stating: "Throughout our history, we have empowered parents seeking to enter the workforce with options for excellent early childhood education and care."

41.    In a section about "Employee and Family Retention and Engagement" and the Company's "Culture and Values," the Registration Statement characterized the quality of care provided by KinderCare teachers in unequivocally positive terms, stating in pertinent part as follows:

Our belief that we are more than just teachers is core to our culture and serves as a guiding principle across all actions we take. ***Our teachers are advocates for their students, giving them the confidence to try new things and develop socially. We summarize our calling to impact children and families in our actionable and behavior-based Service Values, which are shared by all our teams***:

- ***I build great relationships with families;***
- ***I anticipate and quickly resolve parent concerns;***
- ***I genuinely care about every child in my classroom;***
- ***My team works together to make our center warm and welcoming;***
- ***An important part of my job is talking with parents about their children; and***
- ***I respond to the unique needs and interests of every child***.

42.    Likewise in a section discussing "Health & Safety," the Registration Statement highlighted the "robust practices" and "rigorous health and safety standards" maintained in "all" of the Company's locations, stating in applicable part as follows:

> ***We employ robust practices that support the overall well being of the children we serve, as well as our employees and staff***.
>
> **Classroom Safety**
>
> ***We maintain rigorous health and safety standards within all our classrooms across our over 2,400 centers and sites. Center directors regularly provide safety training to their teachers and staff to ensure our employees are updated on our latest protocols and adhere to our safety standards***. Twice a month, teachers and children participate in disaster drills, including fire, active threat, earthquake and tornado scenarios among others. Several times daily, we conduct name-to-face roll calls to ensure all children are safe and accounted for and building access is restricted to only authorized family members. In addition, we partner with medical experts to monitor and continually improve our health and safety protocols at our centers and sites.

43.    The statements in ¶¶35-42 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the IPO:

> a.    that numerous incidents of child abuse, neglect, and harm had occurred at KinderCare facilities;
>
> b.    that KinderCare did not provide the "highest quality care possible" at its

facilities, and, indeed, in numerous instances had failed to provide even basic care, meet minimum standards in the child care industry, or comply with the laws and regulations governing the care of children; and

    c.    that, as a result of (a)-(b) above, KinderCare was exposed to a material, undisclosed risk of lawsuits, adverse regulatory action, negative publicity, reputational damage, and business loss.

44.    Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

45.    Under Item 303, the Registration Statement was required to disclose the actual standard of care utilized in KinderCare facilities, as well as the attendant risks, as these facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in KinderCare stock speculative or risky. No such disclosures were made.

46.    Indeed, the risk factors that were provided in the Registration Statement were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose the adverse events that had already occurred and therefore posed an imminent threat to the Company's business and operations. For example, the

Registration Statement stated that "***reported*** incidents or ***allegations*** of inappropriate, illegal or harmful acts to a child at any child care center or site, or through a third-party provider, whether or not directly related to or involving us, ***could***" negatively impact KinderCare's business, but failed to disclosed the numerous incidents of inappropriate conduct or otherwise substandard care that had occurred at KinderCare facilities prior to the IPO. Moreover, the statement that reports or allegations of misconduct ***could*** negatively impact a child care company's business is simply an acknowledgement of a general risk to the industry, not a disclosure of the specific misconduct present at KinderCare facilities, especially when read in conjunction with the Registration Statement's repeated emphasis that KinderCare provides the "highest quality care possible." By definition, the provision of the "highest quality care" would render any such allegations of impropriety untrue. Likewise, the Registration Statement included a misleading description of the risks relating to lawsuits or governmental actions in response to lapses in care quality because the Registration Statement failed to disclose any actual incidents of misconduct underpinning those actions, did not admit that any allegations levied against the Company in connection therewith were in fact true, and in fact countered their veracity by claiming that the relevant risks remained "[w]hether or not claims have merit." In addition, the Registration Statement affirmatively represented: "We are not currently involved in any litigation that we expect, either individually or in the aggregate, will have a material and adverse effect on our business, financial condition or results of operations."

## EVENTS FOLLOWING THE IPO

47.    On April 3, 2025, research analyst Edwin Dorsey published a report about KinderCare titled "Problems at KinderCare Learning Companies (KLC)" in a newsletter known as "The Bear Cave" (the "Bear Cave Report"). The Bear Cave Report summarized the results of

its investigation into KinderCare as follows:

> Today's investigation from The Bear Cave finds that KinderCare often fails to deliver the safe and nurturing environment it promises parents and taxpayers. The Bear Cave finds that toddlers escape from the KinderCare daycares onto busy roads, are left alone locked inside KinderCare buildings and buses, and are physically, verbally, and sexually abused, with many cases going unreported until bystanders raise alarm or video evidence circulates. In sum, The Bear Cave believes KinderCare is a broken business that harms the children and families it claims to help.

48.     The Bear Cave Report then provided a litany of examples, some of which are discussed below, where the Company utterly failed to care for children in its custody. Examples included an 11-month-old child becoming ill from exposure to cocaine, which was later found in a worker's backpack in the infant room. The site in question had numerous prior safety violations, which – far from the highest quality care possible – included "'staff being aggressive with infants,'" "'undocumented injuries,'" and "'access to power tools and toxic chemicals.'"

49.     Another example involved a three-year-old toddler found roaming the streets outside a KinderCare center that had previously been cited for ten violations during an unannounced visit by state licensing inspectors, which included violations of health and safety protocols. At the same facility, a teacher was also suspended for leaving a child unattended.

50.     In another instance, KinderCare personnel locked a 2-year-old alone inside a facility when the child's mother arrived 15 minutes late to retrieve her. The mother had to call the police who pried the door open in order to free the child.

51.     Similarly, at yet another KinderCare location, personnel left a 5-year-old child alone and locked in an 80-degree-plus bus for two hours.

52.     Even more shocking, the Bear Cave Report cited incidents of intentional child abuse. For instance, after two suspicious parents sewed a recording device into their 20-month-

old toddler's jacket, the recorded audio captured a KinderCare employee threatening children. Verbal threats to the children included the following:

- "I'm gonna go and I'm going to beat both of y'all. That's what I'm going to do."

- "I'm about to throw some b*tch swings at some of y'all right now."

- "Get up and move! Sit down (baby whimpers). Sit you're a** down. Come sit down [name redacted]."

- "Touch it and you die."

- "Just get away from me because I will end up in jail."

53.    In another incident, one KinderCare teacher repeatedly poured water on a sleeping child while another filmed the abuse for social media consumption. The child had previously been sent home several times for having what the staff claimed were "accidents."

54.    In a particularly shocking incident, a KinderCare teacher was arrested for child abuse after reportedly "'yelling at the victim and repeatedly punching the child with both an open and closed fist to the back and side of the head.'"

55.    On several occasions, individuals employed by KinderCare were later arrested on charges of child sex abuse.

56.    On April 3, 2025, KinderCare responded to the Bear Cave Report, acknowledging that the incidents had occurred, that KinderCare was not only aware of the incidents but had investigated them (despite the fact that they were not disclosed in the Registration Statement), and that the incidents ran contrary to the quality of care that the Company had claimed to provide in the Registration Statement, stating in relevant part as follows:

> We are aware of this report. These were isolated incidents and not reflective of KinderCare's values and the high standards we set for

18

ourselves.  In the event that incidents do happen in our centers, we have a strict protocol to promptly notify families and licensing agencies.  We also work quickly to resolve issues directly with families by taking accountability and addressing what went wrong.  To that end, in each of these referenced incidents, we conducted an investigation and have taken all actions necessary to ensure the safety of the children in our care, including the termination of teachers who were at fault.

57.    On April 24, 2025, online magazine *Evie* issued an article titled "Why Are Babies Testing Positive For Cocaine At The Nation's Biggest Daycare Chain?"  The article described the Bear Cave Report as a "damning new investigative report [that] has pulled back the curtain on what might be the worst scandal in America's childcare system at KinderCare."  The article stated the "long list of scandals begs the question: How many isolated incidents does it take before it starts to become a pattern?"  The article also gathered negative reviews from parents, some of whom "describe absolute chaos" and recommended avoiding KinderCare facilities "'at all costs.'"

58.    On June 5, 2025, Edwin Dorsey published a follow-up report in The Bear Cave titled "More Problems at KinderCare (KLC)" (the "Second Bear Cave Report").  The Second Bear Cave Report noted: "Now these concerns are entering the mainstream, allegations against the company are growing, [and] lawmakers are demanding accountability . . . ."  As evidence, the Second Bear Cave Report cited a statement from a congresswoman questioning the continued federal funding of KinderCare:

We'll be writing to House leadership and DOGE to address this disgusting report.

If you can't keep children safe – and worse, are complicit in their abuse – you do NOT deserve a dime of taxpayer funding.

59.    Since the IPO less than a year before the date of this complaint, the price of KinderCare stock has fallen to lows near $9 per share – ***substantially less than half the $24 per***

*share IPO price*.  The price of KinderCare stock has remained substantially below the IPO price at the time of filing this complaint.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action on behalf of all purchasers of KinderCare common stock in or traceable to the IPO (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  KinderCare common stock is actively traded on the NYSE and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by KinderCare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

62.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

63.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.   whether defendants violated the 1933 Act;

      b.   whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations, and risks of investing in KinderCare; and

      c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

65.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I
### Violations of Section 11 of the Securities Act Against All Defendants

66.     Plaintiff incorporates all the foregoing by reference.

67.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against KinderCare, the Individual Defendants, and the Underwriter Defendants.

68.     This Count does not sound in fraud.  Plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

69.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

70.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement as signatories and/or directors of the Company named with their consent in the Registration Statement or as the underwriters of the IPO.

71.    KinderCare, which was owned by Partners Group, is the registrant for the IPO.  As the issuer of the shares, KinderCare is strictly liable to plaintiff and the Class for the misstatements and omissions.

72.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

73.    By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

74.    Plaintiff purchased KinderCare common stock registered pursuant to the Registration Statement and traceable to the IPO.

75.    Plaintiff and the Class have sustained damages.  The value of KinderCare common stock has declined substantially subsequent to and due to defendants' violations.

76.    At the time of their purchases of KinderCare common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed

this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II
## Violations of Section 15 of the Securities Act Against the Individual Defendants

77.     Plaintiff incorporates all the foregoing by reference.

78.     This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against Partners Group, KinderCare, and the Individual Defendants.

79.     Partners Group controlled KinderCare at the time of the IPO through its ownership of KinderCare shares, its appointment of KinderCare executives and members of the Board, its control over the Company through various transactions and agreements with KinderCare, and its historical relationship with the Company and its management.

80.     The Individual Defendants controlled KinderCare at the time of the IPO by virtue of their status as directors and/or senior officers as detailed herein. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of KinderCare and/or through their positions with KinderCare's private equity owner, Partners Group.

81.     Defendants KinderCare and Partners Group controlled the Individual Defendants and all of their employees.

82.     The defendants named herein each also participated in the violations of §11 of the 1933 Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Registration Statement, selling KinderCare common stock in the IPO, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

A.    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B.    awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: October 14, 2025                         Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/Phillip Kim*
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: philkim@rosenlegal.com

**THE SCHALL LAW FIRM**

24

Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Fax: (877) 590-0483
Email: brian@schallfirm.com

*Counsel for Plaintiff*